# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| DONALD R. BALDWIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:05cv0166 |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | Judge Thomas A. Wiseman, Jr. |
| Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Before the Court is Plaintiff Donald R. Baldwin's Motion for Summary Judgment Based upon the Administrative Record (Doc. No. 9), seeking reversal of the Commissioner's denial of his claim for Supplemental Security Income ("SSI") or, alternatively, remand pursuant to sentence four of 42 U.S.C. § 405(g). Plaintiff also filed a Memorandum of law in support of his motion (Doc. No. 10); the Commissioner of Social Security ("Commissioner" or "Defendant") has filed a response opposing Plaintiff's motion (Doc. No. 13), and Plaintiff filed a reply brief (Doc. No. 14).

Upon review of the Administrative Record as a whole (Doc. No. 5, Attachment; hereafter, "AR"), the Court finds that the ALJ failed to comply with 20 C.F.R. § 416.927 in evaluating the medical opinion of Plaintiff's treating physician, Dr. Michael Rhodes, and in evaluating the opinions of the non-examining state agency doctors, which constituted reversible error regardless of whether substantial evidence in the record might otherwise have supported the ALJ's decision. Plaintiff's motion will be therefore be granted to the extent he seeks remand to the Commissioner for further proceedings consistent with this opinion, and denied to the extent he seeks judgment in his favor as a matter of law.

## I. INTRODUCTION

Plaintiff protectively filed his application for SSI on March 12, 2002, alleging disability commencing March 31, 1999 due to pain and "mental and physical ailments." (AR 58, 65.) After Plaintiff's application was denied initially and upon reconsideration (AR 33–34, 35–36), Plaintiff requested

---

[1] Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of the Social Security Administration. Fed. R. Civ. P. 25(d)(1).

and received a hearing, at which he was represented by an attorney. (AR 45–46, 47–53.) The hearing was conducted on May 19, 2004 before Administrative Law Judge ("ALJ") Robert C. Haynes in Nashville, Tennessee. (*See* AR 556–85.) At the hearing, the Plaintiff, through counsel, amended the alleged onset date to the date of an accident that occurred on February 15, 2002. The ALJ issued a written decision denying Plaintiff's application on July 15, 2004. (AR 17–23.) The Appeals Council denied Plaintiff's request for review by Notice dated January 6, 2005 (AR 5–8), thereby rendering the ALJ's decision the final decision of the Commissioner.

This civil action was thereafter timely filed, and the Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(c).

## II.    STATEMENT OF FACTS

### A.    Background

Plaintiff was born February 23, 1963 and was forty-one years old at the time of the ALJ's decision, a "younger person" under Social Security's regulations (the "Regulations"). 20 C.F.R. § 416.963(c). He completed school through the ninth grade and subsequently obtained his GED. (AR at 561.) His past relevant work has consisted of employment as a painter and drywall finisher. (AR 561.) He lives with his mother in Springfield, Tennessee.

Plaintiff filed an application for SSI in February 1998, which was denied at the initial level in May 1998. Plaintiff did not appeal that denial, and the current application does not allege disability prior to the denial of his first application.

Although many of the same reasons alleged in support of his first disability claim are still factors in his present disability claim, the event that precipitated the current application was a motor vehicle accident on February 15, 2002 (the "the February 2002 Accident"), in which a pick-up truck reportedly rolled over Plaintiff and caused serious injuries including spinal and rib fractures and a collapsed lung, as detailed below.

### B.    The Medical Evidence

Plaintiff's medical records, including some going back to 1991, document a long history of back pain, various psychiatric complaints, and substance abuse. X-ray reports predating the February 2002 Accident indicate frequent complaints of pain but no major abnormalities except for loss of normal lordotic curve of spine, ossification in anterior longitudinal ligament at C4-5 (noted in September 2000) (AR 533),

and degenerative disk disease at L5-S1 as of October 2000. (AR 528.) Also included in the Administrative Record are a Psychiatric Review Technique Form and a Residual Functional Capacity Assessment – Mental, both conducted by DDS psychologist John Hill, Ph.D., on April 6, 1998. Dr. Hill found that Plaintiff was subject to certain non-exertional limitations at that time, but not so substantial as to render him disabled. (AR at 115–23, 124–27.) These records have marginal, if any, relevance to Plaintiff's current disability application.

The Administrative Record is also replete with treatment notes regarding Plaintiff's psychiatric care off and on from September 1997 through August 2003. At various times during that time frame, Plaintiff was diagnosed with depression, alcoholism, drug abuse, social/interpersonal problems, trouble coping with daily living, panic disorder with agoraphobia, dysthymia and antisocial personality disorder; his practitioners' notes indicate they occasionally found him to exhibit "drug-seeking" behavior. With some ups and downs, Plaintiff was apparently doing better through the spring and summer of 2003. He stopped obtaining mental health treatment after August 2003, but continued obtaining mental health medications for depression and anxiety from his primary care physician. Because Plaintiff's mental health history is not at issue in Plaintiff's request for judgment in this case, a detailed history of his mental health records would be superfluous. A detailed look at his physical health records from February 2002 forward will, however, be helpful.

### (1)     Plaintiff's Physical Health Records on and after the February 2002 Accident

Plaintiff was admitted to the Vanderbilt University Trauma Center on February 16, 2002 after he had reportedly been working under a pick-up truck when it rolled over him. (AR 196.) He had an L1-L2 burst fracture with retropulsion fragments and a smaller T12 compression fracture, as well as bilateral rib fractures and bruising of the left side of his chest and upper abdomen (with tire marks). (AR 196–97.)[2] Surgery on his back was postponed initially because he was discovered to have ileus (bowel blockage) secondary to his injury. After that was remedied, he was found to have a collapsed left lung that required surgery. He later developed pneumonia. (AR 188.) After being stabilized, he finally underwent spinal surgery on March 1, 2002. His back surgery included partial L1 and L3 laminectomies and a full L2 laminectomy; L1 and L2 foraminatomies bilaterally; L2 transpedicular bony decompression utilizing

---

[2] Plaintiff "[a]dmit[ted] to tobacco, ETOH use, cocaine use" (AR 197), and lab studies from that date were positive for Benzodiazepines (e.g., Klonopin), Cannabinoids, and Cocaine.

ligamentotaxis; and posterior spinal fixation and fusion of T10, T11, L1, L3 and L4, with transpedicular screw fixation and ProOsteon coral bone substitute allograph. (AR 191.) The surgery was considered successful and achieved good alignment of the spine and the instrumentation. (AR 187.)

Plaintiff was discharged home on March 6, 2002, and was noted to be doing well on March 25, with upper-extremity strength at 5/5 and 4+ to 5/5 in his lower extremities "except as limited by pain." (AR 187.) He reported decreased sensation to light touch and pain (a non-dermatomal distribution) over the lateral aspects of the legs from hips to ankles. His surgical wound was healing well. He was continued on Tylenol and Motrin, and his Lortab prescription refilled. (AR 187.)

At a three-month follow-up examination on May 20, 2002, his x-rays showed good alignment and good incorporation of the coral graft, but the Plaintiff continued to complain of continuous low-back pain radiating into his legs, non-dermatomal and non-radicular. On physical exam he had 5/5 strength in all four extremities proximally and distally, with some minimal muscle spasm and tenderness to palpation. (AR 184.) At that point, Plaintiff was not interested in pursuing additional neuro-radiographic studies (*e.g.*, myelogram and post-myelogram CT and EMG study) but was sent back to his regular doctor for referral to a pain specialist. He received prescriptions for Percocet and Soma but was told he would not receive further pain medication from his neurologist, Dr. Weil, unless he underwent further neuroimaging work-up. (AR 185.)

Records from the Northbrook Medical Center (AR 272–97) indicate Plaintiff complained of chest pain and hypoxia, as well as leg pain and swelling, periodically throughout from December 2001 through May 2002. No objective findings documented the cause of his chest pain. (AR 277–79, 288–90, 293–97.) On May 28, 2002, he presented at the ER complaining of back pain as well as of shortness of breath and wheezing. He was found to have marginal oxygen concentration (AR 272) and was admitted for further treatment and examination to rule out pulmonary embolus. (AR 273.) His CT scan was unremarkable (AR 291–92) and he was treated with oxygen, bronchodilators and antibiotics. (AR 273.) The admission note states: "[U]nderstandably, the patient has had considerable pain since discharge" following his February 2002 injuries. (AR 273.) It also states that "his compliance with treatment and his behavior has [sic] been a problem recently and he admits to using illicit drugs." (AR 273.)

In fact, urine drug scans performed on that date were positive for ethanol, benzodiazepines (which could include Plaintiff's prescription Klonopin (*see* AR 280)), cannabinoids, and cocaine. (AR

285.)  Plaintiff was considered "somewhat oversedated" in appearance and "not completely alert."  (AR 274.)  His principal diagnoses included chest pain and shortness of breath probably related to asthmatic bronchitis plus restrictive lung disease, excessive use of tranquilizers and narcotics, use of illicit drugs including cocaine and marijuana.  (AR 274.)  He refused a prescription for Lortab, saying it would be bad for his liver (about which the doctor commented:  "he could well be right about this").  He was placed on Demerol instead and his level of tranquilizers reduced (he had been placed on Dilaudid in the ER).  (AR 275.)  Another Progress Note indicates Plaintiff was "used to taking Dilaudid and Klonopin in fairly large doses.  This may be suppressing his respiration and  . . . we need to try to reduce these medications." (AR 272.)  The next day, he was still complaining of right-side chest pain and "demanding Class II narcotics."  (AR 271.)  Demerol was discontinued and he was started on Darvon for pain as it was considered to carry a lower risk of habit-forming potential.  He had also been demanding to smoke, and was been allowed to smoke a cigarette twice a day.  No evidence of pulmonary embolus was found.  (AR 271.)

At a follow-up "Multisystem Exam" conducted on June 19, 2002, Dr. Bassel at the NorthCrest Physicians' Services noted Plaintiff's chief complaints to be back pain and left leg pain.  The doctor found him to have a "stiff, antalgic gait" and decreased range of motion.  (AR 270.)

As of September 10, 2002, Plaintiff was a new patient at the Millbrook Medical Center in Springfield, Tennessee.  At that point he denied drinking alcohol or abuse of street drugs.  (AR 269.)  On September 24 and October 3, 2002, he was complaining again or still of pain and muscle cramping in his back.  (AR 267–68.)  On the earlier date, Millbrook still had not obtained Plaintiff's prior medical records and so would not prescribe narcotic pain medications.  (AR 268.)  In October, the new doctor (who is not identified on the records) observed that Plaintiff had been described by NorthCrest staff (as noted above) as demanding Dilaudid and Klonopin and had purportedly refused a myelogram ordered by the neurosurgeon.[3]  He was to be given a referral to a pain clinic and taken off Darvocet and "retried" on Lortab and Soma.  (AR 267.)

On October 23, 2002, he had a follow up exam for back pain, complaining of still having a lot of pain and muscle cramps.  He had been given 30 Lortab on October 3, 30 Darvocet on October 17, and

_____

[3] The Court observes that Dr. Weil's records do not indicate Plaintiff affirmatively refused studies ordered by his neurologist.

was now asking for Percocet.  He was deemed to be "drug seeking."  He was given a prescription for Soma and referred to Dr. Donald Boatwright[4] for pain management.  (AR 265.)

On November 1, 2002  Plaintiff again returned to Millbrook requesting medications to cover him until he could get into the Pain Clinic.  He complained of severe lumbar pain but was still assessed as drug seeking.  (AR 263.)  His attending physician also filled out a form dated November 4, 2002 indicating his opinion that Plaintiff was able to return to work.  (AR 262.)

Plaintiff finally saw Dr. Boatwright on November 7, 2002 (AR 261) and December 12, 2002 (AR 260).  The record does not indicate the effectiveness of Dr. Boatwright's recommended treatment but his PCP's treatment note from February 10, 2003 noted that he had been dismissed from the Pain Clinic as a result of testing positive for marijuana, and the Pain Clinic had recommended Plaintiff attend a drug and alcohol rehabilitation program (AR 259).

Plaintiff underwent a multi-level myelogram and post-myelogram spinal CT scans on April 16, 2003 at Skyline Medical Center.  (AR 383–89.)  The reports from the myelogram study indicates the myelogram was difficult to perform because of extensive scarring and small interlaminar space.  Only a small amount of CSF was obtained, not enough for laboratory analysis, but a "satisfactory subarachnoid injection was performed" nonetheless.  The findings in the thoracic spine included no significant spondylosis, mild compression deformity of T12 vertebral body with very minimal retropulsion of the superior endplate of T12 and minimal impression on the ventral thecal sac; compression of L2 with retropulsion fraction fragment superiorly into the spinal canal and "mild impression with distortion of ventral thecal sac but widely patent posterior decompression."  The pedicle screws at T10, T11, T12, L1, L3 and L4 appeared to be in place.  There was a minimal ventral extradural defect at L4-5 consistent with minimal bulge, and "very minimal retrolisthesis at L4 with respect to L5."  (AR 383.)  At L1-2, moderate to severe compression and loss of vertebral body height of L2; retropulsion of the superior endplate of L2 posteriorly into spinal canal; mild stenosis of the lateral recess at top of L2, more on left due to retropulsed fracture fragment; possible mild nerve root compression; mild narrowing of foramina bilaterally, but no definite nerve root impingement in foramina; at L2-3, a mild disc bulge but no central canal or foraminal stenosis; at L4-5, a mild disc bulge, mild ligamentum flavum hypertrophy with minimal

---

[4] Some of the medical records in the Administrative Record from Dr. Boatwright are for a patient named Tommy Martin with a different social security number, also complaining of back pain but in his case resulting from loading trucks in Alabama.  (AR 264, 266.)

impression on the thecal sac anteriorly and posterolaterally and no foraminal stenosis; minimal ventral extradural defect at L4-5 consistent with minimal bulge; very minimal retrolisthesis of L4 with respect to L5; disc degeneration at L5-S1; at T5-6, very minimal left ventrolateral disc protrusion with partial effacement of left ventrolateral thecal sac. The general "impression" included "Minimal spondylosis within thoracic spine"; (2) compression deformity of T12 with minimal impression on ventral thecal sac due to slight retropulsion; (3) fracture of L2 with retropulsion posteriorly at superior endplate, mild compression of ventral thecal sac and widely patent posterior decompression. Mild bilateral lateral recess of stenosis at top of L2 and slight right foraminal narrowing, minimal left foraminal narrowing; (4) minimal spondylosis at L2-3, L4-5, L5-S1 with no significant central can or foraminal stenosis. (AR 383–87.)

The results of the post-myelogram CT scan were consistent with the myelogram results, showing minimal spondylosis at multiple levels of the thoracic spine; compression deformity of the T12 vertebral body with minimal impression on the ventral thecal sac due to slight retropulsion, fracture of L2 with retropulsion posteriorly at superior endplate of L2 with mild compression on the ventral thecal sac and widely patent posterior decompression; mild bilateral recess stenosis at the top of L2, slight right foraminal narrowing and minimal left foraminal narrowing; minimal spondylosis at L2-3, L4-5, and L5-S1 with no significant central canal or foraminal stenosis. (AR 386–87.) The practitioner reading these results did not express an opinion as to the degree of pain or discomfort that could be expected to accompany these objective findings.

Plaintiff began treatment with Dr. Michael Rhodes at the Millbrook Medical Center on June 13, 2003. Dr. Rhodes saw and treated Plaintiff at least seventeen times between June 2003 and February 2004. (*See* AR 240–57 (treatment notes from the Millbrook Medical Center (Dr. Rhodes) dated June 13 and 20, July 14, August 11, September 9, September 29, October 7, November 4, November 18, December 2, December 22, and December 31, 2003, and January 14, January 19, January 23, and February 12, 2004.) At those visits, Plaintiff complained consistently of low back pain and muscle spasms, as well as depression and anxiety. He continued to receive refills of his pain medications (generally Percocet and Soma), as well as Paxil, Zanaflex, and occasionally Demerol or Lortab, Bextra and Valium. He frequently reported that his pain medication was not working or "did not hold". (*See, e.g.*, AR 246, 250, 251, 254, 256.) In January 2004, a Medical Imaging Report from an x-ray noted stability in

the placement of the surgical hardware but no acute abnormality and or changes compared with "the May 2002 exam." (AR 508.)

In July, 2004, Plaintiff was treated at NorthCrest Medical Center for a broken elbow, which required surgery. He reported having fallen about eight feet off a ladder while helping a friend cut a tree branch. Besides breaking his elbow, Plaintiff's fall also exacerbated his back pain. (AR 411–44.)

In August 2004, Plaintiff presented again at the NorthCrest Medical Center ER (this time arriving from jail on a stretcher), complaining of right arm and back pain after falling from a top bunk. (AR 465–84.) He was noted to have no radiologic symptoms and normal range of motion in all four extremities. (AR 466–67.) Cervical spine x-rays revealed "degenerative changes without acute bony abnormality," not much changed from a November 2000 exam. (AR 469.) Lumbar spine x-rays showed hardware from prior surgery, apparently intact and an "old" 50% compression fracture of L2. The impression was "extensive postoperative changes with mild degenerative changes and old L2 compression fracture. There is some compression fracture of T12 which is also stable at about 20% to 30%." (AR 471.) He was ambulatory upon discharge, and was given instructions on back pain exercises, back injury prevention, and chronic back pain (see AR 474, 477–82).

He arrived again at the ER, this time via ambulance from home, just over a week later, complaining of back and right arm pain and shortness of breath. He reported that his car would not run and he could not get to his doctor in Clarksville but was out of Lortab and Xanax. He was given Lortab and sent home with the same instructions on chronic back pain as he had been given previously. (AR 401–10.)

### (2)    Treating and Non-Examining Medical Source Opinions

### a.    Residual Functional Capacity Assessment – Physical (6/14/2002)

After Plaintiff applied for SSI on March 12 (less than two weeks after his spinal surgery), a State Agency physician, George Bounds, M.D., conducted a Residual Functional Capacity Assessment on June 14, 2002 based upon his review of Plaintiff's medical records. (AR 198–207.) Because only four months had passed since the February 2002 Accident, Dr. Bounds was required to predict what Plaintiff's condition would be as of eight months into the future, or one year following the accident. (AR 198.) Based on the Plaintiff's current condition at the time of the evaluation and Plaintiff's physician's notes from his post-surgical examination and x-rays on March 25, 2002, Dr. Bounds predicted that by February

2003, Plaintiff's impairments (in particular, pain) would have resolved with prescribed medical treatment; that he would not need to walk with a cane; and that he would be capable of lifting a maximum of 20 pounds, to lift 10 pounds frequently, to stand and/or walk with normal breaks for six out of eight hours, and to sit for a total of six out of eight hours. Dr. Bounds felt that Plaintiff's complaints of pain were "partially credible" and therefore justified limiting postural positions to "occasionally." (AR 199–200.) No other limitations were predicted.

Based upon Dr. Bounds' assessment, an accompanying Vocational Assessment by Robert Ridley for the Tennessee Department of Human Services found it unlikely that Plaintiff would be able to perform his past relevant work, but likely that he would retain the capacity to perform light, semi-skilled work with occasional posturals. (AR206–07

### b. Residual Functional Capacity Assessment – Physical (9/5/2002)

Another Physical RFC performed by State Agency physician Reeta Misra, M.D. in September 2002 likewise predicted Plaintiff's capacity as of February 16, 2003 based on his present situation. This second assessment is basically identical to the one performed in June 2002, predicting that, by February 2003, Plaintiff would be capable of lifting 20 pounds occasionally and 10 pounds frequently, of standing and/or walking six hours out of an eight-hour workday, and of sitting about six hours out of eight. He was expected to have unlimited ability to push and/or pull, and to be limited to occasionally climbing, balancing, stooping, kneeling, etc. positions (AR 231–36.) Dr. Misra's assessment was based on her review of Plaintiff's surgical records. She noted he "tolerated surgery well" and as of March 25, 2002, was doing well with minor irritation at wound sight and 5/5 motor strength in upper extremities, 4+/5 in the lower extremities "except as limited by pain." While she noted that Plaintiff complained of pain and decreased sensation in lower extremities, she felt his symptoms and pain would "continue to improve to projected RFC within 12 mos of onset or 2/03." (AR 235–56.) The accompanying Vocational Assessment was likewise virtually identical to the first. (AR 237.)

### c. Plaintiff's Treating Physician's Medical Assessment of Ability to Do Work-Related Activities (Physical) (5/14/2004)

Dr. Michael Rhodes, who, as noted above, began treating Plaintiff in June 2003, completed a "Medical Assessment of Ability to Do Work-Related Activities" on May 14, 2004, more than two years *after* Plaintiff's February 2002 Accident. In his assessment, Dr. Rhodes noted Plaintiff had complained of

chronic back pain since February 2002 secondary to trauma and surgery; his symptoms included pain, fatigue, numbness in left leg and decreased range of motion. (AR 391.) Plaintiff's prognosis, in Dr. Rhodes' opinion, was "guarded." (AR 391.) Plaintiff rated his pain as 8/10, constant and radiating to the lower extremities. Under "clinical findings and objective signs," Dr. Rhodes stated: "See Skyline myelogram lumbosacral report 4/17/03 also permanent surgical scar on lumbar." He indicated that some of Plaintiff's medications, including Percocet and Soma, had side effects such as causing drowsiness and occasional nausea. Dr. Rhodes felt that Plaintiff's impairments had lasted or could be expected to last at least twelve months, and that Plaintiff was not a malingerer. (AR 391.)

He opined that Plaintiff's pain and other symptoms interfered constantly with his attention and concentration necessary to complete simple tasks lasting as little as two hours. (AR 392.) He felt the Plaintiff was unable to tolerate much movement and was incapable of even a "low stress" job; could walk 1 city block without rest or severe pain; could stand for 20 minutes at a time, sit for 10 minutes, and stand/walk and sit for a total of less than 2 hours in an 8-hour workday. In addition, Dr. Rhodes believed Plaintiff needed a job that permitted him to shift positions at will and to walk around for five minutes every ten to fifteen minutes. (AR 392–93.) He felt Plaintiff could lift less than 10 pounds occasionally, occasionally climb stairs, but never stoop, crouch, crawl or climb ladders. (AR 393.) Dr. Rhodes also indicated that Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described by the Plaintiff and in the physical evaluation. Finally, Dr. Rhodes indicated that Mr. Baldwin had been subject to the limitations he described since the accident in February 2002. (AR 394.)

### C.      Plaintiff's Testimony at the Hearing

At the hearing, Plaintiff acknowledged that he had had problems with alcohol and street drugs in the past, including primarily marijuana and cocaine, but that he had "put that behind [him]." (AR 562–63.)

Plaintiff described the February 15 Accident as follows:

> Well, I was hooking up a wire under the dash of my truck. And the – my truck started rolling back, and I thought I could hold it because it was a little S-10, and it started dragging me down the road, so I let it go. And the front tire come across my chest and it punctured my left rib – my left lung with a rib and it shatter the vertebrae in my back.

(AR 563.) Plaintiff stated that, since that time, his left leg has been completely numb and occasionally gives out on him, causing him to fall. (AR 564.) His back has been in constant pain, sometimes more intensely than at other times, and his right leg has given him pain since a crushing injury that occurred

when he was in high school.  He rated the pain in his back as a six or seven out of ten, at its best, when his pain medication was working effectively.  (AR 565.)  He stated he had been told he had developed a tolerance to the pain medications he had been taking, and at times, even with pain medication, his pain was at an 8 or 9 out of 10.  He testified that the medication never completely kills the pain; it just made his "life a little bit more functional."  (AR 566.)  He was at that time taking Zoloft and Xanax for anxiety.  (AR 566.)

Plaintiff also stated he has trouble sleeping at night and frequently sleeps several hours during the day.  (AR 567.)  He avoids lifting anything heavy as it exacerbates his back pain, but does occasionally help his mother carry in light bags of groceries.  (AR 567.)

Plaintiff testified he could stand or walk for about 20 minutes comfortably before the pain in his back made him want to sit down.  (AR 568.)  He estimated that he would be able to stay on his feet a total of about two hours out of an eight-hour workday.  (AR 568–69.)  He stated that if he sits in a straight-backed chair for longer than 10 or 15 minutes, his back becomes stiff and has to get up and walk around.  He also estimated he could sit for a total of approximately 2 out of 8 hours in a workday.  (AR 569.)  He testified that he spends most of his time lying flat on his back and that bending over, crouching and stooping also cause pain.  (AR 570.)

Plaintiff continues to live with his mother.  She does all the housecleaning, laundry, and cooking.  (AR 571.)  Plaintiff has not had a valid driver's license since 2001.  He testified he does not participate in virtually any activities outside the house.  (AR 572.)  He primarily lies down, sleeps and watches television.  (AR 573.)  He no longer works with a mental health practitioner, but his primary care physician, Dr. Rhodes, continues to prescribe mental health medication for him.  (AR 573.)

Under questioning by the ALJ, Plaintiff stated he had tried to work "a few little side jobs" here and there, for cash, like painting a room.  (AR 575.)  When asked how long it had been since he used alcohol or illegal drugs, he stated he had smoked a joint "about a month ago" when he was making the transition from Paxil, which had stopped working for him, to Zoloft.  (AR 575.)  He had had a couple of beers two weeks ago, but otherwise had not used much alcohol in the past couple of years.  (AR 576.)

> **D.** **Testimony At the Hearing – Vocational Expert**

A vocational expert ("VE"), Kenneth Anchor, Ph.D., testified at the hearing.  The VE classified the Plaintiff's past work as a painter as medium and semi-skilled, and his past work as a drywall applicator as

medium and skilled. The ALJ asked him to take into consideration a "younger" individual with that work background, who had the equivalent of a high-school education and the functional ability to lift 20 pounds maximum and 10 pounds frequently, to stand and walk 6 hours a day, sit 6 hours a day, and occasionally perform postural activities. The VE stated that given these parameters, the individual could perform a full range of jobs at the sedentary and light levels of exertion. (AR 578–79.) When the ALJ asked the VE to consider these same limitations, but to assume the individual required a sit/stand option, the VE stated that such an individual could work as a quality-control clerk, general clerk, cashier, storage attendant, and machine tender, of which there were, in the aggregate, more than 26,000 jobs in the Tennessee labor market. (AR 579–80.)

The ALJ then asked whether there were jobs in the Tennessee labor market that a person of Plaintiff's age, education and work experience could perform if he was limited to lifting no more than 10 pounds, could never stoop, crouch, crawl or climb ladders and could only occasionally climb stairs. The VE responded that those limitations would eliminate all the jobs he had previously mentioned except for that of cashier, of which there are approximately 14,000 jobs in Tennessee. (AR 580.)

The ALJ also asked the VE to consider the potential abilities of an individual with the limitations described by Dr. Rhodes in the Medical Assessment of Ability to Do Work-Related Activities (Physical) form that he filled out on May 14, 2004, including the ability to stand and walk less than two hours and sit for less than two hours in an eight-hour work day. The VE agreed that a person with those exertional limitations could not perform full-time work. (AR 579.)

With respect to non-exertional impairments, the ALJ asked whether a person who could perform simple and detailed tasks adequately, and could persist adequately and adapt to routine changes in the work setting, could perform the jobs previously identified, including Plaintiff's past work. The VE stated that he could. (AR 581.) Further, a person with a marked decline in the ability to adapt and a moderate decline in the ability to concentrate and persist could nonetheless perform the jobs the VE had previously identified, all of which were at the semi-skilled or unskilled level. (AR 581.) The VE also indicated that a person with GAF value in the range of from 41 to 50 is considered to be in the serious range of impairment, and any rating of 45 or lower would rule out all work. At 46 to 50, a very small number of unskilled jobs would be available, depending on other factors, and none of the jobs he had previously

identified would be available. At the range of 51 to 60, a person could perform most jobs at the semi-skilled or unskilled level, including those jobs the VE had previously identified. (AR 581–82.)

When asked more specifically whether there were any jobs in the economy that could be performed by a person with a GAF rating of 46 to 50 and who was exertionally restricted to lifting no more than ten pounds, the VE stated he did not believe so. (AR 582.) In addition, the VE noted that pain at the severe level, chronic, intractable, and unresponsive to treatment intervention, would rule out all work. (AR 583.)

## III.    THE ALJ'S FINDINGS

In his written decision, the ALJ made the following specific findings:

1.    The claimant has not engaged in substantial gainful activity since the application date.

2.    The claimant's degenerative disc disease, substance abuse, anxiety, and bipolar disorder are considered "severe" based on the requirements of the Regulations 20 CFR § 416.920(b).

3.    These medically determinable impairments do not meet or equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.    The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

5.    The claimant has the following residual functional capacity: for light work with moderate mental functional limitations in adaptation to change, and maintenance of concentration, persistence, and pace. In the absence of drugs his functioning level would be higher in accordance with the treatment notes and psychological examination. The claimant has been absent from treatment for a long period, indicating a less severe level of impairment [sic].

6.    The claimant is unable to perform any of his past relevant work (20 CFR § 416.965).

7.    The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 416.963)

8.    The claimant has "a limited education" (20 CFR § 416.964).

9.    The claimant has no transferable skills from the semi-skilled work previously performed as described in the body of this decision (20 CFR § 416.968)[.]

10.    If the claimant could perform the full range of light work, considering the vocational factors of age, education and work experience, a directed conclusion of "not disabled" would result under Rule 202.18 of Appendix Two to Subpart P, 20 CFR 404.

11.    Although the claimant's additional nonexertional limitations do not allow performance of the full range of light work, using Medical-Vocational Rule 202.18 as a framework for decision-making, there are a significant number of jobs in the

national economy that he could perform. examples of such jobs include: quality clerk, general clerk, cashier, storage attendant, and machine tender.

12. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(g)).

(AR 22–23.) As a result of these findings, the ALJ rejected Plaintiff's claims for SSI. (AR 23.)

The ALJ could not have reached a finding of "not disabled" if he had not completely rejected Dr. Rhodes' May 2004 assessment of Plaintiff's work-related abilities, and accorded great weight to the opinions of non-treating consultants George W. Bounds, M.D. and Reeta Misra, M.D. as set forth in their RFC assessments completed on June 14, 2002 and September 5, 2002. The ALJ's complete analysis of the opinions of each of these physicians, respectively, is as follows:

> George W. Bounds, M.D., and Reeta Misra, M.D., Tennessee Disability Determination Service (DDS) medical consultants completed physical residual functional capacity assessments on June 14, 2002, and September 5, 2002. These limit the claimant to occasionally lifting/carrying 20 lbs. and frequently 10 lbs.; and standing/walking/sitting about 6 out of 8 hours; occasionally climbing, balancing, stooping, kneeling, crouching, and crawling. This is light work. Exhibits 8F, 12F.

> The assessment by Dr. Rhodes is significantly limiting and purports to relate back to February 2002, the time of the injury. However, it appears Dr. Rhodes did not begin to treat the claimant until 2003; his very limiting assessment is inconsistent with MRI report with no significant changes, compared to previous exam of May 28, 2002. This opinion is not supported by the record considered as a whole; therefore, Dr. Rhodes' assessment is not accorded significant weight. Considerable weight has been given to Drs. Bounds and Misra. Their opinions are consistent with the records in evidence when viewed in their entirety. Exhibits 8F, 12F. Therefore, these opinions have been given great weight.

(AR 20.)

## IV. DISCUSSION

Under the Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. The Act provides that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). This Court, therefore, is limited to determining whether substantial evidence supports the Commissioner's findings *and* whether the Commissioner applied the correct legal standards. *See Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). If substantial evidence supports the ALJ's conclusion, this Court cannot reverse the ALJ's decision even if substantial evidence exists in the record that would have supported an opposite conclusion. *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995). Conversely, however, the Court must reverse and remand for further findings if the ALJ applied incorrect legal standards, even if the

factual determinations are otherwise supported by substantial evidence and the outcome on remand is unlikely to be different. *See, e.g.*, *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545, 546 (6th Cir. 2004) (observing that "it is an elemental principle of administrative law that agencies are bound to follow their own regulations," and holding that a court "cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, . . . a different outcome on remand is unlikely. [A] procedural error is not made harmless simply because [the aggrieved party] appears to have had little chance of success on the merits anyway." (internal quotation marks and citation omitted)).

In this case, the ALJ determined that the Plaintiff was not disabled because, although his combination of impairments prevented him from performing his past relevant work, there was nonetheless work in the national economy that would accommodate his residual functional capacity and vocational factors. As previously indicated, the ALJ, in reaching that decision, rejected Plaintiff's treating physician's assessment of Plaintiff's physical limitations and instead adopted the opinions of two agency consultants who reviewed Plaintiff's medical records and rendered such opinions within several months after the February 2002 Accident.

Plaintiff's arguments in support of reversal or remand are that in rejecting Dr. Rhodes' opinion and accepting those of the agency consultants, (1) the ALJ failed to comply with the requirements set forth in 20 C.F.R. § 416.927 for evaluating the medical opinions of Plaintiff's treating physician, which constituted reversible error; and (2) the ALJ failed to comply with the requirements set forth in 20 C.F.R. § 416.927 for evaluating the medical opinions of the non-examining State Agency Program physicians, which likewise constituted reversible error. These contentions are addressed below.

A. **The ALJ's Rejection of Dr. Rhodes' Assessment**

(1) *The Requirements of 20 C.F.R. § 416.927*

According to the Regulations, "[m]edical opinions are statements from physicians . . . or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). The Regulations expressly require the agency to "consider" the medical opinions in the record along with the other relevant evidence. 20 C.F.R. § 416.927(b). Even more importantly, the regulation requires the agency always to "give good reasons"

for not giving weight to a treating physician's medical opinion in the context of a disability determination. 20 C.F.R. § 416.927(d)(2).

As the Sixth Circuit has recognized, a Social Security Ruling further explains that, pursuant to this regulation, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (SSA July 2, 1996), cited in Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004) (in the context of considering the application of the identical regulations pertaining to DIB as opposed to SSI). "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that [he] is not, unless some reason for the agency's decision is supplied." Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the "treating physician rule" and permits meaningful review of the ALJ's application of the rule. Wilson, 378 F.3d at 544–45 (citing Halloran v. Barnhart, 362 F.3d 28, 32–33 (2d Cir. 2004)). As the Sixth Circuit demonstrated in Wilson, an ALJ's failure to give "good reasons" is reversible error, regardless of whether the ALJ's decision is otherwise supported by substantial evidence. Id. at 546.

Social Security Ruling 96-2p further articulates how the Commissioner is to consider a treating source's medical opinions. The agency must give the treating source's medical opinion controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the claimant's case record. Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2. Moreover, even when an ALJ declines to give a treating source's medical opinion "controlling weight," he must consider whether it should nonetheless be accorded the "greatest weight" of all the medical opinions in the record in deference to the treating source's more extensive knowledge of the claimant's medical impairments. The Ruling states:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed

using all the factors provided in 20 C.F.R. § 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

The referenced regulations specify several relevant factors for determining the weight to be given a medical source's opinion: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion, *i.e.*, "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (3) the opinion's consistency with the record as a whole; and (4) whether the opinion is from a specialist, among other potentially relevant but unspecified considerations. 20 C.F.R. § 416.927(d).

Finally, if an ALJ decides to reject a treating physician's opinion, his decision must contain specific reasons to support the amount of weight (or lack thereof) given to the treating source's opinion, supported by evidence in the case record, and the reasons given must be sufficiently specific to make clear to any subsequent reviewers the weight accorded the treating source's medical opinion. 20 C.F.R. § 416.927(d); Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *5; *Shelman*, 821 F.2d at 321. Moreover, when an ALJ rejects the treating physician's medical conclusion, the basis for rejecting it must be other medical evidence in the record. The failure to refer to other medical evidence in the record in support of the ALJ's rejection of the treating source's opinion amounts to application of an erroneous legal standard with respect to the opinions of the claimant's treating physician. *Shelman*, 821 F.2d at 321.

In *Wilson v Commissioner of Social Security*, the Sixth Circuit discussed the "treating physician rule" in the Regulations with particular emphasis on the requirement that the agency "give good reasons" for not affording controlling weight to a treating physician's opinion in the context of a disability determination. 378 F.3d at 544. The court noted that 20 C.F.R. § 404.1527(d)(2)[5] expressly contains a "good reasons" requirement. In light of the applicable regulations, the Sixth Circuit articulated a three-part procession that an ALJ's opinion must follow if he rejects a treating source's medical opinion: First, the ALJ must find that the treating physician's opinion is not being given controlling weight and state the reasons therefor in terms of the regulation, *i.e.*, the absence of support by medically acceptable clinical

---

[5] *Wilson* dealt specifically with 20 C.F.R. § 404.1527, which governs Social Security disability claims. The analysis is equally applicable to the identically worded § 416.927, which pertains to claims for supplemental security income.

and laboratory techniques or inconsistency with other evidence in the case record. Second, the ALJ must identify evidence in the record that supports that finding. Finally, the ALJ must explain his application of the factors listed in 20 C.F.R. § 404.1527(d) to determine what weight should be accorded the treating physician's opinion. *Id.* at 546.

As set forth above, the ALJ's discussion of Dr. Rhodes' opinion states in full:

> The assessment by Dr. Rhodes is significantly limiting and purports to relate back to February 2002, the time of the injury. However, it appears Dr. Rhodes did not begin to treat the claimant until 2003; his very limiting assessment is inconsistent with MRI report with no significant changes, compared to previous exam of May 28, 2002. This opinion is not supported by the record considered as a whole; therefore, Dr. Rhodes' assessment is not accorded significant weight.

(AR 20.) Plaintiff in this case argues that the ALJ's decision does not comply with the regulatory requirement that he "give good reasons" for rejecting Dr. Rhode's medical opinions concerning the nature and severity of Plaintiff's physical impairments. Specifically, he argues that the ALJ's opinion "falls short in two respects": (1) it states only generalized reasons for rejecting Dr. Rhodes' opinions, rather than "good reasons," and without citing any specific evidence from the record to support his decision; and (2) the ALJ did not describe or apply the factors listed in 20 C.F.R. § 416.927(d)(2) for determining the weight that should be given to Dr. Rhodes' medical opinions.

### *(2)    The ALJ Failed to Articulate "Good Reasons."*

As Plaintiff points out, the ALJ found that Dr. Rhodes' opinion was "not supported by the record considered as a whole, but the only reasons he provided in support of that finding were that: (1) Dr. Rhodes' opinion supposedly related back to February 2002, the time of the injury, although Dr. Rhodes did not begin treating Plaintiff until 2003; (2) the ALJ considered Dr. Rhodes' "very limiting assessment" to be "inconsistent with MRI report with no significant changes, compared to previous exam of May 28, 2002." (AR 20.) In response to these "reasons," Plaintiff argues first that the fact that the treating physician's opinion "relates back" to an injury that occurred sometime before the physician began treating the patient is not a "good reason" for discounting the treating physician's opinion, particularly given that the consulting physicians' opinions, which were accorded great weight, were given just months after Plaintiff's traumatic injury and merely predicted his future prognosis. The Court agrees. Even more critically, however, Dr. Rhodes' opinion regarding Plaintiff's abilities did not simply purport to "relate back" to the injury of February 2002; rather, he quite clearly assessed the Plaintiff's current condition, but with

reference to the very serious nature of his injuries and the surgery he had undergone, and with the assumption that his condition had not changed significantly in the intervening period. As a result, he concluded that Plaintiff had been subject to the limitations he described since the February 2002 Accident (AR 394.) The Court agrees that this "reason" is no reason at all for rejecting a treating physician's opinion, even when considered in conjunction with the ALJ's other "reasons." *Cf. Begley v. Mathews*, 544 F.2d 1345, 1354 (6th Cir. 1976) ("Medical evidence of a subsequent condition of health, reasonably proximate to a preceding time may be used to establish the existence of the same condition at the preceding time." (citing Wigmore, Evidence §§ 225, 233 (3d ed. 1940)).

With respect to the ALJ's finding that Dr. Rhodes' opinion was "inconsistent  with MRI report with no significant changes, compared to previous exam of May 28, 2002," Plaintiff points out that the ALJ's finding of "no significant change" between May 2002 and January 2004 is based on a report reading an x-ray performed on January 22, 2004. As Plaintiff argues, the primary purpose of the x-ray would be to verify that the extensive hardware surgically implanted in Plaintiff's spine remained stable and intact; an x-ray was not intended to show with any degree of clarity the soft-tissue type problems of which Plaintiff complained. Plaintiff further points out that he underwent a myelogram and CT scan of his thoracic and lumbar spine in April 2003, which the ALJ failed to consider at all, although Dr. Rhodes referred to these tests in reaching his conclusions about the degree of Plaintiff's impairment. Plaintiff asserts that these exams reveal the soft-tissue injuries and abnormalities that provide an objective basis for Plaintiff's leg and back pain.

The Defendant argues, in response, that the x-ray to which the ALJ referred did in fact show no significant changes since May 2002 (AR 281–82, 508), and that the myelogram and CT scan in April 2003 showed only minimal spondylosis with no significant central canal or neural foraminal stenosis or nerve root impingement, and thus supported the ALJ's conclusion of "no significant change." (*See* AR 386–87, 389.) The Defendant ignores, however, that those findings actually included "minimal spondylosis" at numerous levels, including L2-3, L4-5, L5-S1; "fracture of L2 with retropulsion posteriorly at the superior endplate of L2 with mild compression on the ventral thecal sac with a widely-patent posterior decompression [and] mild bilateral lateral recess stenosis at the top of L2 [and s]light right foraminal narrowing and minimal left foraminal narrowing"; as well as "[c]ompression deformity of the T12 vertebral body . . . with only minimal impression on the ventral thecal sac owing to slight retropulsion."

(AR 386–87.) No physician of record has indicated that these changes were not sufficient to cause the persistent and severe back pain of which Plaintiff has consistently complained. More importantly, the ALJ did not refer to or even consider the April 2003 studies in rejecting Dr. Rhodes' opinion.

In other words, as Plaintiff also argues, although the ALJ broadly concluded that Dr. Rhodes' "opinion is not supported by the record considered as a whole" (AR 20), this is the type of "generalized statement" that the *Wilson* court held did not meet the "good reasons" requirement of 20 C.F.R. § 404.1527(d)(2) (and § 416.927). The ALJ simply failed to point to any relevant evidence in the record that actually contradicted or failed to support Dr. Rhodes' opinion.

The Court therefore finds that the ALJ failed to comply with 20 C.F.R. § 416.927 by failing to give "good reasons" for his rejection of Dr. Rhodes' assessment of Plaintiff's physical impairments.

### *(3) The ALJ Failed to Apply the Factors Listed in 20 C.F.R. § 416.927(d)(2).*

In addition, as Plaintiff argues, the ALJ improperly failed to apply and consider the factors enumerated in 20 C.F.R. § 416.927(d)(2) to determine what weight, if not controlling weight, should be accorded Dr. Rhodes' opinion. Specifically, the ALJ's decision ignores that Dr. Rhodes treated Plaintiff every two to three weeks between June 2003 and February 2004; it ignores Dr. Rhodes' reference to the myelogram and CT scan of April 2003; it ignores all the references in Dr. Rhodes' treatment notes to objective clinical signs supporting Plaintiff' subjective complaints of chronic, consistent pain, including decreased range of motion, muscle spasms, and joint and muscle tenderness; and it fails to note the state agency physician's opinion that Plaintiff's allegations of pain were at least "partially credible." (AR 200.)

Defendant's argument in response refers to evidence in the record that would support the ALJ's opinion and reiterates that the ALJ's decision is supported by substantial evidence in the record. The point, however, is that the ALJ himself did not refer to the relevant evidence when he completely discounted Dr. Rhodes' assessment. In sum, although the ALJ was not required to give Dr. Rhodes' assessment controlling weight, the ALJ failed to consider any of the relevant factors enumerated in the regulations to determine what amount of weight should be given to the treating physician's opinion, including "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, [and] consistency of the opinion with the record as a whole." *Wilson*, 378 F.3d at 543 (citing 20 C.F.R. § 404.1527(d)(2)). Instead, the ALJ simply

rejected the opinion. This was error, particularly in light of the complete absence of any countervailing agency consultant opinions that are based on actual medical records rather than conjecture.

Because the ALJ failed to cite "good reasons" for his rejection of Dr. Rhodes' assessment and because he failed to apply the factors enumerated in 20 C.F.R. § 416.927(d)(2) to determine the appropriate amount of weight to be given to Dr. Rhodes' opinion, remand is required.

**B.      The ALJ's Adoption of the Non-Examining State Agency Physicians' Opinions**

*(1)      The Applicable Law*

When an ALJ declines to accord controlling weight to the medical opinion of a treating physician, he is required to evaluate the medical opinions of non-examining state agency physicians by applying the same factors he is supposed to consider in determining the weight to be given the treating physician's medical opinion. 20 C.F.R. § 416.927(f). Social Security Ruling 96-6p provides that § 416.927(f) requires the opinions of non-treating/non-examining medical sources to be weighed by stricter standards than are required for weighing the opinions of treating physicians. That Ruling also recognizes that the hierarchy for weighing medical opinions is related to the strength of the ties between the source of the opinion and the claimant, as follows:

> The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker. For example, the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources.
>
> For this reason, the opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence *including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency*, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist. The adjudicator must also consider all other factors that could have a bearing on the weight to which an opinion is entitled, including any specialization of the State agency medical or psychological consultant.

SSR 96-6p, 1996 WL 374180, *2 (S.S.A. July 2, 1996) (emphasis added).

Clearly, opinions from State agency medical consultants may, in "appropriate circumstances," be entitled to more weight than the opinion of a treating physician. *Id.* at *3. Ruling 96-6p provides as an example of an appropriate circumstance a situation where the State agency's medical consultant's

opinion "is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source."  *Id.*  Generally speaking, however, "the opinion of a nonexamining physician is entitled to little weight if it is contrary to the opinion of the claimant's treating physician."  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

### (2)     The ALJ's Findings

The ALJ in this case accorded "great weight" to the medical opinions of two non-examining state agency program physicians, despite the facts that (1) they were contrary to the opinion of Plaintiff's treating physician and (2) the circumstances do not appear to justify giving more weight to the consulting physicians' opinions than to the treating physician's opinion.

The ALJ's discussion of these opinions, as set forth above, states *in toto*:

George W. Bounds, M.D., and Reeta Misra, M.D., Tennessee Disability Determination Service (DDS) medical consultants completed physical residual functional capacity assessments on June 14, 2002, and September 5, 2002.  These limit the claimant to occasionally lifting/carrying 20 lbs. and frequently 10 lbs.; and standing/walking/sitting about 6 out of 8 hours; occasionally climbing, balancing, stooping, kneeling, crouching, and crawling.  This is light work.  Exhibits 8F, 12F.

. . . .  Considerable weight has been given to Drs. Bounds and Misra.  Their opinions are consistent with the records in evidence when viewed in their entirety.  Exhibits 8F, 12F.  Therefore, these opinions have been given great weight.

(AR 20.)  In other words, the ALJ adopted wholesale the opinions of the state agency consultants with no analysis whatsoever.  This Court finds it particularly troubling that the ALJ failed to take into consideration the fact that the consultants' opinions were rendered, respectively, only four and seven months after Mr. Baldwin sustained the injuries that gave rise to his disability claim.  The opinions did not purport to assess Mr. Baldwin's condition at the time the opinions were formed.  In fact, neither consultant opined that Mr. Baldwin appeared to be malingering or that his subjective complaints of pain lacked credibility at the time of their record examinations.  Rather, both consultants speculated as to what Plaintiff's condition would be as of February 2003, several months into the future.  The ALJ also failed to consider the fact that the consultants did not have the benefit of reviewing the April 2003 myelogram and CT scan reports, since these tests had not yet been performed.  Likewise, the consultants did not have the benefit of several years' worth of medical treatment notes documenting Plaintiff's consistent complaints of chronic and debilitating pain.

In sum, the Court finds that the ALJ failed to comply with 20 C.F.R. § 416.927(f) in evaluating the non-examining state agency physicians' opinions, a legal error which, like the error in reviewing the opinion of Plaintiff's treating physician, requires remand.

**V.     CONCLUSION**

For the reasons set forth above, the Court finds that the ALJ failed to apply the correct legal standards.  This matter will therefore be remanded in order for the Commissioner to properly evaluate the opinions of Plaintiff's treating physician and those of the non-examining state agency physicians concerning the nature and severity of Plaintiff's spinal impairments consistent with 20 C.F.R. § 416.927.

An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge